IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:20-CV-427

MYONG C. COYNER, Administrator of
the Estate of ROBERT LEE STUART,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

**COMPLAINT**

## STATEMENT OF THE CASE

Robert Stuart died from bladder cancer on January 28, 2018. The Durham VA Hospital saw him for complaints of bloody urine and voiding symptoms starting in September 2015. Instead of sending a doctor to see him, the VA had two midlevel practitioners evaluate him. They attributed his symptoms to a urinary stone without pursuing a complete urological workup with a cystoscopy. Mr. Stuart continued to be seen for similar symptoms through June 2017. The VA never had a urologist see Mr. Stuart. Finally, in June 2017, Mr. Stuart's bleeding and pain was so bad that he went to a local emergency department at WakeMed Cary. Those doctors immediately ordered appropriate tests and, within a few hours, diagnosed him with bladder cancer that had spread through his body. Mr. Stuart fought hard, taking debilitating chemotherapy and enduring a gruesome, extensive surgery. Tragically, metastatic bladder cancer killed him in spite of his brave efforts.

COMES NOW Plaintiff Myong C. Coyner, Administrator of the Estate of Robert Lee Stuart complaining of Defendant alleges and says:

## PARTIES

1. Myong Coyner is an individual over the age of 18 (eighteen) years of age, under no legal disability, and is the widow and duly appointed administrator of the Estate of her late husband, Robert Lee Stuart.

2. Mr. Stuart was born on March 29, 1940, and died on January 25, 2018. He served in the Army and received medical care from the VA.

3. On January 3, 2018, prior to his death, Mr. Stuart filed a SF-95 Form complaining of the medical malpractice he suffered at the Durham VA. On November 1, 2018, the Estate filed an amended SF-95 Form alleging wrongful death arising from medical malpractice at the Durham VA.

4. At all relevant times, Mr. Stuart and Mrs. Coyner lived in Wake County, North Carolina. They were married until his death.

## JURISDICTION

5. This action arises under the Federal Tort Claims Act, 28 U.S.C. §1346(b).

6. Pursuant to 28 U.S.C. §2675(a), Plaintiff timely filed an administrative claim as required by the Federal Tort Claims Act more than six (6) months ago.

7. Mr. Stuart and Mrs. Coyner lived in Wake County, North Carolina so venue is proper in this Court.

2

## FACTS

8. On September 16, 2015, physician assistant Phyllis Lungelow evaluated Robert Stuart at the Durham VA Medical Center ("VAMC") outpatient clinic.

9. Mr. Stuart complained of urinary frequency and urgency.

10. PA Lungelow requested a urinalysis, which revealed both white blood cells and red blood cells in Mr. Stuart's urine.

11. PA Lungelow diagnosed a urinary tract infection and prescribed ciprofloxacin, an antibiotic. She ordered a CT scan of Mr. Stuart's abdomen.

12. No physician saw Mr. Stuart at that visit.

13. On October 16, 2015, a non-contrast CT scan of Mr. Stuart's abdomen showed the presence of a small non-obstructing stone in his left ureter.

14. On November 10, 2015, nurse practitioner Jodi Johnson-Thomas saw Mr. Stuart in the VAMC urology clinic.

15. Mr. Stuart had noticed a lot of blood in his urine and complained of urinary frequency and urgency. Mr. Stuart did not complain of pain to suggest he had a symptomatic kidney stone.

16. NP Thomas requested a urinalysis, which revealed both white blood cells and red blood cells in Mr. Stuart's urine.

17. NP Thomas ordered urine flow studies and tests for stone-causing elements in Mr. Stuart's urine.

18. NP Thomas did not request cystoscopy to evaluate Mr. Stuart's abnormal urine findings. She did not conduct any further testing to determine if he

3

possibly suffered from cancer. That type of screening to identify or rule out cancer was very simple and routine for a patient with his attributes, clinical findings, and symptoms.

19. No physician saw Mr. Stuart at that visit.

20. On November 24, 2015, Mr. Stuart's urinary flow studies were performed. The results were normal. NP Thomas did not undertake any further action to evaluate his problems.

21. NP Thomas prescribed alfuzosin to improve Mr. Stuart's urinary flow.

22. On January 10, 2016, the attending urologist who supervised NP Thomas, Dr. Philip Walther, co-signed her November 10, 2015, medical record entry. He had not examined or otherwise evaluated Mr. Stuart. He did not review any existing cystoscopy, because none had been taken, or order that type of study for Mr. Stuart. He did not conduct any further testing to determine if Mr. Stuart possibly suffered from cancer. That type of screening to identify or rule out cancer was very simple and routine for a patient with his attributes, clinical findings, and symptoms.

23. On January 21, 2016, PA Lungelow saw Mr. Stuart at the VAMC outpatient clinic for a routine follow up visit.

24. PA Lungelow did not inquire about Mr. Stuart's prior episodes of bloody urine, and she did not re-check his urine for signs of blood or infection. She did not conduct or order any further testing to determine if Mr. Stuart possibly suffered from cancer. That type of screening to identify or rule out cancer was very simple and routine for a patient with his attributes, clinical findings, and symptoms.

4

25. No physician saw Mr. Stuart at that visit.

26. On July 25, 2016, NP Thomas re-evaluated Mr. Sturt in the VAMC urology clinic. He complained that he could not hold his urine and had urinary frequency and urgency.

27. Mr. Stuart's urinalysis was very diluted at that visit. NP Thomas did not order a repeat test despite the fact that the original was very diluted.

28. NP Thomas prescribed oxybutynin, a different drug for Mr. Stuart's urinary flow. She did not conduct any further testing to determine if he possibly suffered from cancer. That type of screening to identify or rule out cancer was very simple and routine for a patient with his attributes, clinical findings, and symptoms.

29. No physician saw Mr. Stuart at that visit.

30. On September 6, 2016, NP Thomas evaluated Mr. Stuart in the VAMC urology clinic. She diagnosed him with an enlarged prostate with lower urinary tract symptoms, and a "tiny" non-obstructing left kidney stone[EB1]. She did not conduct any further testing to determine if he possibly suffered from cancer. That type of screening to identify or rule out cancer was very simple and routine for a patient with his attributes, clinical findings, and symptoms.

31. No physician saw Mr. Stuart at that visit.

32. On September 12, 2016, PA Lungelow referred Mr. Stuart back to the VA urology clinic because blood testing showed that his PSA had risen.

33. On October 13, 2016, a urinalysis showed the presence of both white blood cells and red blood cells in Mr. Stuart's urine.

5

34. A urine culture showed the presence of infection. NP Thomas prescribed him an antibiotic. She did not conduct any further testing to determine if he possibly suffered from cancer. That type of screening to identify or rule out cancer was very simple and routine for a patient with his attributes, clinical findings, and symptoms.

35. No physician saw Mr. Stuart at that visit.

36. On December 14, 2016, PA Lungelow evaluated Mr. Stuart in the VA outpatient clinic.

37. PA Lungelow did not inquire about Mr. Stuart's prior episodes of bloody urine, and she did not re-check his urine for blood or signs of infection. She did not conduct any further testing to determine if he possibly suffered from cancer. That type of screening to identify or rule out cancer was very simple and routine for a patient with his attributes, clinical findings, and symptoms.

38. No physician saw Mr. Stuart at that visit.

39. On April 3, 2017, NP Thomas evaluated Mr. Stuart for worsening symptoms of flank pain, urinary discomfort, and grossly bloody urine[EB2]. NP Thomas entered a very brief history into the VA medical record but did not examine him.

40. NP Thomas treated Mr. Stuart for a urinary tract infection and wrote that Mr. Stuart's symptoms and findings were "[p]ossibly related to stone disease, BPH [benign prostatic hypertrophy], incomplete bladder emptying, prostatitis." She did not conduct any further testing to determine if he possibly suffered from cancer.

6

That type of screening to identify or rule out cancer was very simple and routine for a patient with his attributes, clinical findings, and symptoms.

41.     No physician saw Mr. Stuart at that visit.

42.     On May 4, 2017[EB3], a urinalysis showed that Mr. Stuart had blood in his urine.

43.     PA Lungelow [EB4]ordered a seven-day course of antibiotics to treat Mr. Stuart and referred him back to the urology clinic. She did not conduct any further testing to determine if he possibly suffered from cancer. That type of screening to identify or rule out cancer was very simple and routine for a patient with his attributes, clinical findings, and symptoms.

44.     No physician saw Mr. Stuart at that visit.

45.     On May 19, a non-contrast CT scan of Mr. Stuart's abdomen and pelvis was performed at the VAMC to "eval[uate] stone burden."  NP Thomas had ordered the study[EB5].[EB6]

46.     On June 5, 2017, Mr. Stuart still suffered from bloody urine, flank pain, and voiding symptoms that were getting worse.

47.     He returned to the VA outpatient primary care clinic where PA Lungelow saw him. She ordered a urinalysis that showed he still had blood in his urine.

48.     PA Lungelow ordered a seven-day course of antibiotics for Mr. Stuart, but shockingly she did not examine him or even talk to him.  She did not even discuss the results of the noncontrast CT scan she had ordered for him that had been taken

about 3 weeks earlier[EB7].  She did not conduct any further testing to determine if he possibly suffered from cancer. That type of screening to identify or rule out cancer was very simple and routine for a patient with his attributes, clinical findings, and symptoms.

49.    On September 19, 2017, NP Thomas sent a communication [EB8]to Mr. Stuart, stating that his "kidney stones on the left have increased in size" (although there was only one stone), and that he had a non-cancerous cyst [EB9]on his right kidney. She did not send him this report until almost three months after doctors from WakeMed had already diagnosed him with metastatic bladder cancer.  Even then, three months later, she still had no clue what was actually wrong with him but just blindly repeated kidney stones and urinary tract infection.

50.    NP Thomas and PA Lungelow had consistently told him that a kidney stone and a benign prostatic hypertrophy ("BPH") caused his continuous urinary symptoms. They never even once tested him for possible cancer using very simple screening that was routine for a patient with his attributes, clinical findings, and symptoms. He never once saw a doctor, much less a urologist, related to these symptoms which fit the classic example of the start of and progression of bladder cancer despite repeatedly seeking care from the VA for these very specific problems for over 20 months, since September 2015.

51.    On June 16, 2017, Mr. Stuart's symptoms got even worse, so he went to the Emergency Department at WakeMed Cary hospital.

8

52. In less than six hours after he arrived, the WakeMed physicians ran proper tests and diagnosed Mr. Stuart with a large bladder tumor.

53. They also found that Mr. Stuart suffered Stage 3 kidney failure.

54. A urologist, Dr. Brandon Rubens, admitted Mr. Stuart to the hospital and performed bladder tumor resection the very next day.

55. Dr. Rubens could not remove all of the tumor and worried that the cancer had spread into the muscles which would be a bad sign associated with a poor prognosis.

56. On July 5, 2017, Duke University Cancer Center doctors evaluated Mr. Stuart. They recommended chemotherapy first, followed by surgery.

57. In July and August 2017, Mr. Stuart received a total of three chemo courses of MVAC [methotrexate/vinblastine/adriamycin/cis-platinum], a very toxic and high-risk regimen of cancer drugs.

58. On July 6, 2017, two months before NP Thomas finally sent Mr. Stuart the incomplete CT report, Mr. Stuart and his wife met with the Durham VAMC Chief of Staff, Dr. Ken Goldberg, and VAMC Risk Manager Joyce Prince. Dr. Goldberg wrote his comments about that meeting in Mr. Stuart's medical record under the header, "INSTITUTIONAL DISCLOSURE OF ADVERSE EVENT." Dr. Goldberg admitted that Mr. Stuart was "not offered cystoscopy or further evaluation during his initial evaluation for hematuria" which led directly to him suffering from a once-treatable bladder cancer in September or October 2015 to the current problem where he had untreatable metastatic bladder cancer that would eventually kill him.

9

59. Dr. Goldberg and Ms. Prince told Mr. Stuart and his wife that he could file an administrative tort claim related to the overt and gross negligence committed by the VA doctors and providers who failed to even bother to test him for possible cancer using very simple screening that was routine for a patient with his attributes, clinical findings, and symptoms. Dr. Goldberg acknowledged that the VA providers should have tested him on several occasions given Mr. Stuart's repeated visits from September 2015 to June 2017.

60. Dr. Goldberg and the VA approved payment for Mr. Stuart's private, non-VA medical treatment for his bladder cancer.

61. On October 26, 2017, UNC urologist, Dr. Michael Woods, examined Mr. Stuart. Dr. Woods noted that Mr. Stuart had a high-grade muscle-invasive bladder cancer with invasion into the prostate. He recommended surgical removal of Mr. Stuart's bladder, prostate, and urethra.

62. On October 31, 2017, Mr. Stuart underwent this high-risk, gruesome, painful surgical procedure which cut out much of his lower groin, from his genitals to his anus, leaving him with a urostomy bag on his abdomen to collect his urine.

63. Mr. Stuart did not recover well from surgery. His bladder cancer spread even more, metastasizing into his bones in his pelvis, leg, and spine. This caused unimaginable pain which could not be controlled, even with heavy drugs.

64. On January 7, 2018, Mr. Stuart was admitted to WakeMed Cary for treatment of sepsis and for palliative care for his painful bone metastases. The doctors could not do much for him because his cancer had spread so much.

10

65. On January 28, 2018, Mr. Stuart died while in Hospice care. He suffered terribly and endured pain up until the end.

**CAUSE OF ACTION:**
**NEGLIGENCE, GROSS NEGLIGENCE, AND WRONGFUL DEATH**

66. Defendant, United States Veterans Administration and its employees, servants, and agents is an agency of the United States, and those employees, servants, and agents were acting within the course and scope of their employment with the Veterans Administration owed Mr. Stuart a duty to treat him using reasonably competent care in accordance with the skill, training, and experience of reasonably competent medical providers practicing under the same or similar circumstances, in the same or similar communities as those involving Mr. Stuart from September 16, 2015, through June 5, 2017; to exercise care and diligence in the application of their knowledge and skill to the medical care provided to Mr. Stuart in from September 16, 2015, through June 5, 2017; and to use their best judgment during the course of the medical care provided to Mr. Stuart in from September 16, 2015, through June 5, 2017.

67. At all relevant times, Defendant, United States Veterans Administration and its employees, servants, and agents is an agency of the United States, and those employees, servants, and agents were acting within the course and scope of their employment with the Veterans Administration and for whom Defendant is liable, failed to provide Mr. Stuart with reasonable medical care and breached the applicable standards of care in at least the following aspects:

a. Failing to timely investigate and diagnose the cause for Mr. Stuart's persistent urinary symptoms in spite of multiple visits for the same issues;

b. Failing to employ the appropriate diagnostic modalities, tools, and tests to timely determine and treat the cause of Mr. Stuart's persistent urinary symptoms;

c. Failing to consider alternative explanation for his symptoms when they kept repeating despite treatment for other potential causes;

d. Failing to rule out other potential causes of Mr. Stuart's symptoms when they persisted despite treatment;

e. Failing to consider and test to either identify or rule out bladder cancer; and

f. Other negligence that may be revealed in the course of discovery and litigation in this matter.

## PROXIMATE CAUSE

68. Each negligent or grossly negligent act or omission set forth above caused or contributed to Mr. Stuart's medical problems beginning in September 2015 that led directly and proximately to his extended pain and suffering and, ultimately, his untimely death. As a direct result of these failures and violations of the standard of care through these negligent or grossly negligent acts or omissions as set forth above, Plaintiff is entitled to recover compensatory and non-compensatory damages against the Veterans Administration in an amount in excess of $75,000.00 to be determined at trial.

## EXPERT REVIEW

69. Although Plaintiff submits that the pleading requirement of Rule 9(j) of the North Carolina Rules of Civil Procedure is unconstitutional under both the state

and federal constitutions and violates her equal protection and due process rights as well as her right to equal access to the courts, and though the pleading rule is not contained in the Federal Rules of Civil Procedure, but a procedural rule under the North Carolina Rules of Civil Procedure, out of an abundance of caution, Plaintiff states and asserts that the medical care, and all medical records pertaining to the alleged medical negligence, which are the subject of this Complaint and that are available to Plaintiff after reasonable inquiry, have been reviewed by a medical health provider who Plaintiff reasonably believes will qualify as an expert witness under Rule 702 of the North Carolina Rules of Evidence and who is willing to testify that the medical care complained of did not comply with the applicable standards of care[EB10]. In addition, if the Court should later determine that anyone who has reviewed the medical care complained of in this Complaint does not meet the requirements to testify under Rule 702(b) or (c) of the North Carolina Rules of Evidence, then Plaintiff will seek to have such person or persons qualified as an expert witness by motion pursuant to Rule 702(e) of the North Carolina Rules of Evidence, and Plaintiff moves the Court (as provided in Rule 9(j) of the North Carolina Rules of Civil Procedure) that such person or persons be qualified as an expert witness under Rule 702(e) of the North Carolina Rules of Evidence.

## DAMAGES

70.    As a direct and proximate result of the Defendant's negligence and gross negligence, as set forth above, Mr. Stuart suffered severe and painful injuries to his entire body and mind, ultimately resulting in his death.

71. As a further and direct proximate result of Defendant's negligence and gross negligence, Defendant is liable to Plaintiff for damages under the provisions of North Carolina General Statute §28A-18-2 and for such additional and further damages as the evidence may show.

72. To the extent that the Court determines that N.C. Gen. Stat. § 90-21.19 applies to a Federal Tort Claims Act claim brought in federal court, such as those alleged in this Complaint, Plaintiff objects to that law. The law purports to place a cap on non-economic damages in a medical malpractice case under North Carolina law. The Court should either disregard it as inapplicable or find that it is unenforceable and void because that law violates both the state and federal constitutions, and violates, among other things, her equal protection rights, due process rights, her right to equal and open access to the courts, the right to a jury trial, violates the separation of powers, and confers an exclusive emolument on health care providers and the insurance companies that provide them with professional malpractice insurance as set forth in Amendments VII and XIV of the United States Constitution and Article I, Sections 1, 6, 18, 19, 25, and 32 and Article IV, Sections 1 and 13 of the North Carolina Constitution. Also, it should not apply because Defendant engaged in gross negligence that harmed Mr. Stuart.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays this Honorable Court that she have and recover judgment against Defendant as follows:

14

1. For judgment against Defendant for compensatory and non-compensatory damages in excess of $75,000 (seventy-five thousand dollars);

2. For costs, interest, and attorneys' fees as provided by law; and

3. For such other and further relief as the Court may deem proper.

Respectfully submitted this 5th day of August, 2020.

/s/ W. Ellis Boyle
Joe Thomas Knott, III
N.C. Bar No. 9311
W. Ellis Boyle
NC Bar No. 33826
4800 Six Forks Road, Suite 100
Raleigh, NC 27609
Telephone: (919) 783-5900
Facsimile: (919) 783-9650
Email: joeknott@knottboyle.com
       ellis@knottboyle.com
*Attorneys for Plaintiff*
